## Paris, Appellant, v. Philadelphia.

*Municipalities—Board of Health — Nuisance — Piggeries—Injunction—Equity—Acts of April 22, 1794, 4 C. & B. 309; January 29, 1818, P. L. 38; April 5, 1849, P. L. 346—February 2, 1854, P. L. 21; March 16, 1855, P. L. 89; June 1, 1885, P. L. 37; March 22, 1899, P. L. 14, 15; April 12, 1889, P. L. 45—City of Philadelphia.*

A court of equity upon an application for an injunction to restrain the Board of Health of the City of Philadelphia from the summary abatement of a piggery which the board has adjudged to be a public nuisance, and detrimental to the public health, will decline to restrain the proposed action of the board, unless it is made to appear clearly that the board has acted in bad faith, or has transcended its jurisdiction.

Under Section 27 of the Act of January 29, 1818, P. L. 38, entitled "An act to establish a health officer and to secure the city and port of Philadelphia from the introduction of pestilential and contagious diseases" and later legislation, the present board of health of Philadelphia has the power to suppress a piggery obnoxious to the public health, although such piggery is situated in a portion of the city not included within the limits of the old city of Philadelphia the District of Northern Liberties, Moyamensing, Penn and Southwark.

In suppressing such a piggery it is not necessary for the Board of Health to secure a search warrant prior to its action, where it appears that the character of the piggery is well known to the public and the place itself has been visited by the health officers.

A city, by ordinance, may prohibit the keeping of hogs in a section which theretofore was rural, and in which the business of raising hogs was harmless, but by reason of the city's progressive growth the locality has been changed by the general municipal development so that the vicinity is altered from rural to built up conditions.

Where a piggery in a city has been conducted in such a way as to develop disease producing germs in masses of fermenting garbage and manure, and also larva, flies, mosquitoes and other disease-bearing insects, it will be suppressed, and it is immaterial that the keeper and his family living on the premises have been healthy, and that no particular disease has been directly traced to the piggery.

Argued Dec. 18, 1915. Appeal, No. 274, Oct. T., 1914, by plaintiff, from decree of C. P. No. 4, Philadelphia Co., Sept. T., 1913, No. 1235, dismissing bill in equity in case of Rudolph Paris v. City of Philadelphia, George D. Porter, Director of the Department of Public Safety of said City; Joseph S. Neff, Director of the Department of Public Health and Charities of said City; John A. Vogelson, W. H. Andrus, and A. C. Abbott, constituting the Bureau and Board of Health of said city, and John A. Vogleson, Chief of the Bureau of Health of said City. Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ. Affirmed.

Bill in equity for an injunction. Before WILLSON, P. J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree dismissing the bill.

*Francis Shunk Brown,* for appellant.—The board of health here did not "first obtain a warrant from a justice of the peace in due form of law, founded on a complaint of two householders, under oath or affirmation: Baugh v. Sheriff, 7 Philadelphia 82.

The Act of 1818 specifically applies to the old "City of Philadelphia," District of Southwark and the Townships of the Northern Liberties, Moyamensing and Penn, and, unless supplements to the said act extend the power of the board, they are without authority in the

present instance: Homer v. Com., 106 Pa. 221; Philadelphia, to use, v. Edwards, 78 Pa. 62; Duffield v. Williamsport School District, 162 Pa. 476.

The action of the Board of Health in attempting to compel the removal of plaintiff's hogs and hog pens, is an attempt to deprive plaintiff of his property without due process of law: Philadelphia v. Provident, Etc., Trust Co., 132 Pa. 224; Eddy v. Board of Health, 10 Philadelphia 94; Philadelphia v. Lyster, 3 Pa. Superior Ct. 475; Allegheny v. Heyl, 26 Pitts. L. J. 70; Hutton v. City of Camden, 39 N. J. 122.

The alleged right of the Board of Health to solely determine the existence of the alleged nuisance here, is further negatived by the ordinance of June 24, 1912, which recognizes the right of residents of certain rural districts to keep pigs: Gregory v. City of New York, 40 N. Y. 273; Egan v. N. Y. Health Dept., 20 Misc. N. Y. 38.

The condition of the plaintiff's pig pens, or the pigs and pig pens, do not constitute a nuisance: Shetzline v. Layer, 19 Pa. Dist. Rep. 1025.

*Otto Wolff, Jr.,* Assistant City Solicitor, and *Michael J. Ryan,* City Solicitor, for appellees.

OPINION BY ORLADY, P. J., April 17, 1916:

The plaintiff brought this bill in equity to restrain the City of Philadelphia, acting through its bureau and Board of Health "from trespassing on his property, and from seizing his hogs and destroying his pens, etc.," pursuant to a notice that had been served on him by the board of health, alleging that a nuisance existed on his property, consisting of "insanitary pig pens and surroundings, having a tendency to endanger and be prejudicial to public health," and requiring him to abate the nuisance within ten days, etc. The case was heard on bill, answer, testimony and argument of counsel, and resulted in the court dismissing the bill for the reason

that the plaintiff had failed to make out a case which would justify the court in granting the injunction.

The plaintiff is a tenant farmer of a fifty acre truck farm, on which, in addition to conducting a general trucking business, he raises, buys and sells hogs, of which he keeps on an average one hundred and seventy. The piggery is situate about 600 feet from some dwellings; approximately 2,000 feet from factories and a number of dwelling houses, and about 800 feet from a much-used thoroughfare. The hogs are fed exclusively on garbage gathered from the city. It is alleged, that the pens are cleaned properly and white-washed. The offal is carted from the buildings to a muck, garbage and poudrette pile, and mixed together before being distributed as fertilizing material on the truck farm. The plaintiff's family of himself, wife and eight children reside on the farm; all in good health, and no sickness of any kind has been directly traced to the piggery as an inducing cause, and no complaint has been made by neighbors of its unsanitary state. Its general condition is described by witnesses called by the plaintiff as good— pretty good,—as good as could be expected,—good as you can keep pigs,—sanitary,—and, not unhealthy or prejudicial to the public health. A more critical description is given by witness called in behalf of the city. A number of them, by reason of their extended experience and investigation are recognized by their profession as entitled to the highest credit in this branch of science, and represent the most efficient medical knowledge of this age. These witnesses confirm the judgment of the board of health in every particular, in its condemnation of the plaintiff's piggery as a public nuisance, having a tendency to be prejudicial to the health of the community.

The premises and surroundings are described as follows: The pens are in a vile state, garbage is thrown all around them; there was a profusion of flies and mosquitoes, so thick in places as to cover the boards of the buildings, and the larva could be seen in large numbers

with the naked eye.   The city entomologist visited the place officially, secured over two thousand flies for examination, and from these found ten different species including those which are credited by scientists with transmitting typhoid fever, infantile paralysis, cholera infantum, tuberculosis, malaria and other dangerous diseases.  Several hundred maggots and larva of insects were dug out of the ground at the pens; four or five inches of manure, garbage and filth was on the floor of the pens, and underneath them were pools of foul, stagnant water, which had seeped through the floors.   There was a distinctive, pungent, cutting odor about the place which was carried by air currents a considerable distance.

The main contention of the appellant is that, the resolution of the Board of Health, declaring the plaintiff's pig pens to be a nuisance is not conclusive, so as to bind a court of equity which is asked to restrain the board of health from destroying the pig pens.   This proposition squarely raises the validity of the proceedings, the answer to which must be found in our legislation and the city ordinance, on health protection.   It is interesting to note that the first effective enactment on this important subject had its inception in the melancholy yellow fever pestilence of 1793, and resulted in the establishment of a health office for Philadelphia, by the Act of April 22, 1794, 4 C. & B. 390.   Following this, the subject was considered in a number of special enactments and culminated in the Act of January 29, 1818, P. L. 38, "To establish a health office, and to secure the city and port of Philadelphia from the introduction of pestilential and contagious diseases."   This act of 35 sections has been amended in many particulars, but so far as our search has disclosed, there has been no change in the provisions of Section 27, so far as it relates to the case before us, though the procedure under it has been changed in some details.

It is further contended by the plaintiff, and it was submitted for the approval of the court as a conclusion of law, that the act applying in words, only to the old City of Philadelphia, the district of Northern Liberties, Moyamensing, Penn and Southwark, the present Board of Health is without authority in law, to proceed under its provisions for the reason that the plaintiff's property is outside of the territorial bounds mentioned in the original act.

The section mentioned made it the duty of the Board of Health "to cause all offensive or putrid substances and nuisances which may have a tendency in their opinion to endanger the health of the citizens, to be removed from the lanes, alleys, highways, wharves, docks, or any other part or parts of the City of Philadelphia" and the townships above named.  The first paragraph of the section, authorized the board or its committee—having first obtained a warrant from a justice of the peace, etc., to enter and search......when they may have just cause to suspect a nuisance to exist.  It is not reasonable to hold that this requirement is exacted, where the board of health have passed the point of doubt—where "they may have just cause to suspect any nuisance to exist," and where it is open, notorious, and conducted, as in this case, with the approval and cooperation of a city department.  To search for, would imply a doubt as to location, and as the cause of nuisance exists in this case, and the Board of Health by its officers had entered upon the premises a number of times with the plaintiff's consent to inspect the premises, the technical formality suggested would be a meaningless procedure.  The search warrant would furnish no additional evidence of a fact which was conceded by owner, and municipal authorities to be known by the public.  The substance of the controversy was, the fact of nuisance, and this the plaintiff denied, not because of the place not having physical existence, but because of his theory in regard to his manner of conducting a business, and which, after notice, he

refused and neglected to abate or remedy. He had all the information of the intention of the Board of Health that a search warrant would give him.

The amendment of the Act of 1818, by the second section of the Act of April 5, 1849, P. L. 346, provides that, "Whenever any nuisance shall be found anywhere within the jurisdiction of the board of health, by reason of the keeping of hogs or other animals, the board of health, in addition to their powers of destroying the pens or other enclosures containing such animals or of otherwise abating and removing such nuisance, be and they are hereby empowered to seize such animals, etc." In Kennedy v. Board of Health, 2 Pa. 366, it was expressly held that, under the acts involved here, the board having decided that the nuisance existed on the lot of the defendant, and the fact being so determined by the Board of Health, it made no difference from what cause it arose; it was necessary and proper that it should be removed. There has not been any change in the law in this respect,— Philadelphia v. Etc., Trust Co., 132 Pa. 224; Adams v. Ford, 3 Pa. Superior Ct. 239; Philadelphia v. Lyster, 3 Pa. Superior Ct. 475,—though we agree fully with the court below in holding "There may be cases in which those authorities would base their judgment that a nuisance existed upon facts or conditions of such a character, and so trivial in extent, or obviously for reasons of prejudice or malice that it would be entirely proper for the court to interfere for the protection of persons affected by the action of the public authorities. An eminent authority has said, "They are vested with quasi-judicial authority to decide upon what constitutes a nuisance, and all presumptions favor their action. Cooley, Const. Lim. 5 Ed., p. 722. The summary action upon notice by the board, in the abatement of a nuisance, does not contravene the constitutional rights of private property, but is a necessary exercise of police power, 4 Am. & Eng. Enc. of Law, 601, and cases cited, and we concur in the finding that, in the present case "there is

no reason on which we could properly hold that the
action of the health authorities of the city, was of such
a character as would justify the exceptional interfer-
ence of a court of equity." It is well recognized by the
authorities that the jurisdiction of a board of health,
however, depends upon the existence of a nuisance, and
that is always open to judicial inquiry upon proper cause
being shown: City of Evansville v. Miller, 146 Ind. 613,
38 L. R. S. 163.

The preservation of the public health is uniformly
recognized as one of the paramount objects of govern-
ment, and a most important municipal function. The
power to adopt and enforce sanitary regulations, to pre-
vent the spreading of disease and perfect healthful and
sanitary conditions for the public, is inherent in a
municipality. The law of overruling necessity is some-
times applied to the police power, and in no instance is
it more aptly used than in the abatement of a nuisance
which threatens to develop an infectious or contagious
result: Lakeview v. Rosehill Cemetery, 70 Ill. 191; s. c.
22 Am. Repts. 71-28 Cyc. 709; 4 Am. & Eng. Encl. of Law
597. Municipalities are allowed a greater degree of lib-
erty in legislation in this direction than any other:
Gundling v. Chicago, 176 Ill. 340; 28 Cyc. 709. It has
been held by courts of high repute, that there is no limi-
tation of legislation from enlarging the category of pub-
lic nuisances, or declaring places or property used to the
detriment of, or to the injury of the health, morals or
welfare of the community as public nuisances, although
not such at common law—Lawton v. Steele, 119 N. Y.
226; Grossman v. Oakland, 36 L. R. A. 593—and notes.
A strong abuse of authority must be shown to induce a
court to interfere with the decision of a Board of Health.

The Act of February 2, 1854, P. L. 21, known as the
Consolidation Act, fixed the boundaries of the city, "So
as to embrace the whole territory of the County of Phila-
delphia, and all the powers of said corporation, as en-
larged and modified by this act, shall be exercised and

have effect within the said county and over the inhabitants thereof." The 16th Section providing, "And all the laws of this Commonwealth creating, governing and regulating the Board of Health, not inconsistent herewith, shall continue in force and operation and shall govern and regulate the board of health of the city, except as to farmers manuring land and keeping stock in the strictly agricultural districts, as the same may hereafter be allowed by law or ordinance."

The Act of 1818, is the one which created, governed and regulated the Board of Health then existing, and by the provisions of the Act of 1854, they were extended over—the whole territory of the County of Philadelphia —by the very words of the act. The suggested exception as to farmers and stock keepers does not apply to this plaintiff, as his property both in location and use could not be considered in a strictly agricultural district. As said by the court below, "That exception was applicable to the condition then existing, but does not apply to the territory where the plaintiff resides, which is only partly agricultural and is in the process of becoming urban."

The ordinance of June 24, 1912, as indicated in its title, made it unlawful to keep hogs or swine in the city, except within certain limits; or in any part thereof excepting in a sanitary manner. And as specified in Section 2, "and so as to not be prejudicial to the health of the community." The contention of the city is, that the piggeries and adjacent soil as well as the food and offal of the hogs, and the manner in which the plaintiff's business is conducted is a nuisance, and the court below might well have held, that under the admitted facts, and the known danger of such conditions being a breeding and distributing place for dangerous causes of disease, was a continuing menace, not only to the family of the plaintiff and neighbors, but to large areas of a thickly populated section of the city.

The subject of health protection has been a fruitful source of legislation in this State, and has resulted in

many enactments, which, considered from the viewpoint of the subject considered, are all to be treated as relating to, amending, restricting or enlarging the law in its provisions. The Act of March 16, 1855, P. L. 89, supplementary to the health laws of the city, provided that "The city councils shall, from time to time, exempt from the operation of this, or any other statute law conferring on the Board of Health jurisdiction on the subject of nuisance, such portions of the territory under their jurisdiction, being a rural district or sparse in population, as in their opinion they can do with safety to the health and comfort of the inhabitants thereof, which exemption shall at all times be revocable by the like authority," has not resulted in any special ordinance on the subject, except the one of June 12, 1912, prescribing the limits within which hogs and swine may lawfully be kept, and as above mentioned, the second section of that ordinance provided that it was unlawful and declared to be a nuisance to keep hogs or swine in any part of the city, except in a sanitary manner.

Prior to 1874, there are many laws which seem to be independent of the Act of 1818, but all relate to the general subject of health protection, and the enforcement of the many provisions was delegated to various persons, boards or departments. This situation was to be expected from the development of a great city, originally representing a number of smaller municipal divisions, and its aggressive expansion in population and material development. The Act of 1854, was intended to, and did bring the whole area of the County of Philadelphia under one municipal government, under the title of the City of Philadelphia, "so as to embrace the whole territory of the County of Philadelphia." This consolidation act, by apt words, continued in effect the earlier legislation by providing, in Section 16, that "all laws of the Commonwealth creating, governing and regulating the Board of Health, not inconsistent herewith, shall continue in force

and operation and shall govern and regulate the Board of Health," &c.

The learned court below found (Eleventh), that from the date of the consolidation until the year 1885, the functions and powers of the Board of Health as derived from the statutes mentioned, were exercised by it, and enforced by the courts without challenge, and that, by the Act of June 1, 1885, P. L. 37, the care, management, administration and supervision of police affairs, "and all matters relating to the public health" were declared to be in charge of the Department of Public Safety, and provided that, "the board of health shall continue with the powers and duties now vested in it by law," of which the director of public safety shall be a member, etc.

In 1899, the interest in the subject was so intense as to lead to confusing legislation on the subject. By the Act of March 22, 1899, P. L. 14, the Board of Health, as recognized by the Act of 1885, was abolished, and on the same day, it was enacted (P. L. 15), that "The powers now by law vested in the board of health of cities of the first class, shall be exercised and performed by a bureau of the Department of Public Safety of the city, to be known as the Bureau of Health," and the mayor was directed to organize the bureau at once. On April 12th, of the same year, it was enacted (P. L. 45), that "In cities of the first class the Board of Health shall continue with the powers and duties now vested in it by law."

The amendments of the Act of 1855, as made by the Act of April 8, 1903, P. L. 155, do not affect the question involved in this case, and the Act of July 22, 1913, P. L. 879, while creating an auxiliary department of housing and sanitation, attached to the department of public health and charities, extended the authority of the Board of Health to subjects which were not specifically mentioned in the earlier statutes. Such legislation must have a consistent and uniform interpretation, and, as said by the learned court below, "It is altogether probable that the extensive powers which were conferred

upon the board in the first instance were given to it, because of the apprehension, based upon actual experience, that times of pestilence might arise when summary action on the part of the Board of Health would be necessary for the public welfare. It would not, however, in the nature of things be possible to hold that the act would be valid, and should be sustained at one period of time, and not at another; that the powers of the board would be exercised only in times of general pestilence or epidemic and not at other times when the health of the city might be in a reasonably good condition."

Despite the changes by amendments, as to name of the department, the manner of its selections, employees, etc., we agree with the learned court below that the present board of health represents the powers and duties conferred by the Act of 1818, and while the legislation is in some features confusing, there is a distinct intent to continue such a department for the purpose of preserving the general health of the public by appropriate legislation.

Substantially the same question was considered by this court in Boehm v. Philadelphia, 59 Pa. Superior Ct. 441, and the able argument of appellant's counsel has not changed our mind in regard to the power of the board of health in declaring a dangerous place as a nuisance. The fact that his family is healthy, and that no complaints have been made by his neighbors, is of no significance. Disease producing germs, developed in such a mass of fermenting garbage and manure, and carried by an indefinitely large number of flies and other disease-bearing insects and air currents, must necessarily be a menace to public health, and reasonably be the cause of spreading contagious and epidemic diseases.

Within the past quarter century, the investigations by national and state boards have largely increased our knowledge and enlarged our views on the subject of health protection. Many dangerous epidemics have been traced to definite causes and controlled; many pesti-

lential localities have been reclaimed and made health-
ful by proper sanitation, and preventive treatment at the
source of danger.   These facts have been clearly demon-
strated that they must be accepted as authentic by the
courts, in interpreting the actions of Boards of Health
in suppressing such dangers at the original source.   One
of the most unfailing and prolific means of transmitting
infectious diseases is in the development of larva, flies,
mosquitoes and other disease-bearing insects.   The fe-
cundity of these pests and the areas they infect is beyond
computation, and it is only by rigid inspection of prem-
ises, and enforced hygienic regulation that these dan-
gers can be controlled and minimized.   It cannot be
longer debatable, that such a place as is described in this
record is a dangerous menace to the whole community.

Nor is the fact, as urged by plaintiff's counsel, that no
particular disease has been directly traced to the odors
of this pigsty, of any significance, for the reason that it
is not reasonably possible to trace the source of a par-
ticular disease to an exclusive cause, when that cause is
carried by air currents or insects.   It is sufficient for the
purpose of this case to show with reasonable certainty,
that the plaintiff's property is such a place of danger.
If others are ascertained by sufficient proof, they must
be dealt with upon their own facts.

As said by Mr. Justice BROWN, in Eckles v. Weibly,
232 Pa. 547, "The reasons for preventing a prospective
mischief are at least as cogent as those for abating a
present one.   The call for protection against an appre-
hended injury, reasonably certain to befall, is as impera-
tive as that for relief from one now felt."

There is nothing in this record to indicate that the
Board of Health has acted maliciously or without full
investigation, and the conclusion, that the continuance
of this piggery, as conducted by the plaintiff, is "a nui-
sance having a tendency to endanger, and be prejudicial
to the public health" is amply warranted by the facts
developed at the hearing.

The general rule has been laid down that a court of equity, upon an application for an injunction to restrain a Board of Health from the summary abatement of what it has adjudged to be a public nuisance, detrimental to the public health, will decline to restrain the proposed action of the board, unless it is made to appear clearly that the board has acted in bad faith, or has transcended its jurisdiction, and the rule has been broadly laid down that an injunction will be denied when the jurisdiction conferred on the board is summary in its nature and the procedure proper,—since the objects to be attained by its exercise would be defeated in many cases, if the orders of the Board of Health were subject to judicial examination and revision before they could be carried into effect, and that a court of equity even if it has the power will not, except upon good cause shown, interfere in the measure taken by public officials to protect the public health: 21 Cyc. 405.

The decree is affirmed.