## Commonwealth v. Flexer et al.

Before Keller, P. J., and Biester, J.

*Willard S. Curtin*, district attorney and *Walter S. Hare*, for Commonwealth.

*Achey & Power* and *David S. Kohn* and *H. Albert Lehrman*, Deputy Attorney General, for defendants.

KELLER, P. J., September 2, 1952.—By agreement between defendants and the Commonwealth, these two cases were consolidated and tried together, inasmuch as they involved substantially the same facts and legal questions.

Defendant, Edwin W. Flexer, stands charged on bill of indictment no. 27, May sessions, 1952, with having on March 21, 1952, and at divers other times

within two years last past, in the County of Bucks, placed, put and exposed in a public place, on certain lands of the Commonwealth of Pennsylvania, and on lands of other persons, poison, poisonous substances and admixtures thereof, with the intent that the same shall be taken and swallowed by certain birds, fowls and wild animals, contrary to the act of assembly and against the peace and dignity of the Commonwealth of Pennsylvania.

Defendant, Thomas D. Frye, in bill of indictment no. 47, May sessions, 1952, is charged with having on February 28, 1952, in the County of Bucks, placed, put and exposed in a public place, on certain lands of the Commonwealth of Pennsylvania, and on lands of other persons, poison, poisonous substances and admixtures thereof, with the intent that the same should be taken by certain birds, fowls and wild animals, contrary to the act of assembly and against the peace and dignity of the Commonwealth of Pennsylvania.

Both defendants entered pleas of not guilty and, when the case was called for trial, they elected to be tried by the court without a jury. A written stipulation to that effect was accordingly entered into, signed by the attorneys for defendants and the district attorney. The court, thereupon, ordered that the case be tried without a jury. After hearing the testimony and the arguments of counsel, the court withheld decision, pending a review of the testimony and the law applicable thereto.

In the absence of any rules of procedure for the administration of the act of assembly providing for waiver of jury trials in criminal cases, we followed the procedure adopted in equity and common pleas trials by the court without a jury.

The testimony was practically undisputed and we find the following facts as having been established beyond a reasonable doubt. These facts and findings

necessarily include findings as to the circumstances which gave rise to these prosecutions.

## Findings of Fact

1. In 1949 and 1950 the disease of rabies among foxes spread in epidemic proportions from the southeastern section of the State of New York into the northeastern section of Pennsylvania, and thereafter into the southeastern section of Pennsylvania, including the counties of Chester, Delaware, Montgomery and Bucks.

2. Because of the huge fox population in Pennsylvania, it was evident that the epidemic, if uncontrolled, would be seriously harmful not only to domestic and wildlife animals but also to human beings.

3. As the result of the seriousness of this epidemic among the wild and domestic animals in these sections, the Commonwealth, acting through its Department of Health, Department of Agriculture and the Pennsylvania Game Commission, consulted with each other, as required under section 502 of the Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §182, as well as with the United States Fish and Wildlife Service, as to the best and most effective method to overcome this menace.

4. As the result of this conference, the departments aforesaid were convinced that the Commonwealth was faced with a serious emergency and that it was an urgent necessity that immediate and effective action be taken to exterminate as many foxes as possible, thereby destroying the chain of contact and effectively preventing the spread of the rabies epidemic.

5. As evidence of the interest, attitude, and concern of the people residing in the area most seriously affected by this epidemic, the county commissioners of Chester, Delaware, Montgomery and Bucks Counties appealed to the Pennsylvania Game Commission for relief.

6. Because the State of New York had been unable to cope with a similar epidemic under ordinary methods and the aforesaid department officers being convinced, after consultation with the United States Fish and Wildlife Service and other authorities which had experience with rabies control, that poison was not only the most effective but the only practical means of controlling the epidemic, the departments and the Game Commission determined to follow this procedure. Before embarking on the program of poisoning, however, all other methods had been considered, including hunting, trapping, and increase of bounties. None of these was considered sufficiently effective to bring the epidemic under immediate control.

7. After having decided upon the poison program the matter was submitted to the Governor for his approval. The departments and commission also consulted with the office of the Attorney General for legal advice as to their rights and powers under the law to pursue this program. Being advised that they were within their authority and the law and the Governor having approved the plans, the program was initiated.

8. The enforcement of this program was placed in charge of and under the supervision of the Pennsylvania Game Commission. This commission, in futherance of the enforcement, directed its executive director, Thomas D. Frye, one of defendants herein, to transmit the instructions given to him by the commission for carrying out the program to its supervisors and protectors.

9. Although, under the provisions of the act of assembly, the executive director, who is also designated as the chief administrative officer and chief game protector, has charge of all activities under the jurisdiction of the commission, and shall have charge of, direct, supervise and control all other game protectors and employes of the commission, defendant,

Thomas D. Frye, as executive director and chief game protector, took no active part in these conferences and had nothing to do with originating and creating any program or orders for its enforcement.

10. The only activities and connection of defendant, Thomas D. Frye, with the poison placement program were to relay and transmit the orders of the commission to the director of the Bureau of Wildlife Conservation, Mr. Gilford, who, in turn forwarded them to the division supervisors and to the game protectors throughout southeastern and northeastern Pennsylvania.

11. Defendant, Thomas D. Frye, at no time was in Bucks County in connection with the enforcement of this program. He had no personal contact or communication with Edwin W. Flexer, the game protector of Bucks County, and did not participate in any manner whatsoever in the overt act of the exposure of poison for the destruction of foxes and other wild animals, birds or fowl.

12. Defendant, Edwin W. Flexer, was the district game protector in Bucks County and, admittedly, carried out the instructions for the enforcement of the program received from his division supervisor.

13. Defendant, Edwin W. Flexer, pursuant to the instructions received from his district supervisor, admittedly placed a large number of poison pellets, estimated to be between 1,000 and 1,500, in various sections of the eastern half of Bucks County. He kept a record of the number of pellets placed and checked the sets from time to time to ascertain whether any of them were missing. The places where these pellets were deposited were identified by various markings, blazed trees, cloth tape and stones. He also put up numerous signs in the vicinity, giving warning notice to the public of the exposure of this poison.

14. Included among the sections whereon these

poison pellets were placed was a tract of State game land no. 139, in East Rockhill Township, part of which adjoins the farm owned by Henry L. Freking, situate in Richland Township.

15. On March 22, 1952, Mr. Freking found a sign nailed to a tree at the entrance to his land, on which was printed: "Danger. Rabies. Poison is being used in this rabies infested area by trained officers to prevent the spread of rabies as a protection to human life, livestock, pets, and all forms of wildlife. Caution.

"1. Do not handle or use dead animals, crows, or other birds found anywhere in this area.

"2. Tie up or house your dogs and cats.

"3. Keep away from any fox or other animal, wild or domestic, that acts unusual, and report suspects or incidents to the nearest veterinarian, dog law enforcement officer, or game protector.

"The Pennsylvania Department of Health

"The Pennsylvania Department of Agriculture

"The Pennsylvania Game Commission."

Affixed to those warning signs was the seal of the Commonwealth.

16. In addition to the above-mentioned signs at the entrance to his lane, Mr. Freking observed several similar signs in the vicinity.

17. Mr. Freking was the owner of two dogs, one a boxer, which he usually kept chained, and the other a beagle. The signs made little impression upon him and, notwithstanding the warning contained therein, he occasionally allowed these dogs freedom to run.

18. On March 25, 1952, Mr. Freking unchained the boxer. He was unable to restrain him and he ran into the woods. The boxer returned after a short time, ate his supper, dropped to the floor, and in a few minutes thereafter expired. The beagle, which had also been running free, came back and died almost immediately upon its return.

19. A post-morten examination was subsequently had on the beagle by a veterinarian, who testified that, although he had made no chemical analysis as to the cause of its death, there were specific symptoms which indicated that it died of strychnine poisoning.

20. On the evening of March 26, 1952, Mr. Freking called the game protector, Mr. Flexer, to ascertain whether he had placed any poison on his land, to which Mr. Flexer replied that he had not, but had placed some on the game lands.

21. Subsequently, to wit: On March 29, 1952, after several conferences and consultations with his neighbors, including Walter S. Hare, Esq., a newspaper reporter and member of the bar of Philadelphia, and after further telephone conversation with defendant Flexer, Mr. Freking lodged an information or complaint, prepared by Walter S. Hare against defendant Edwin W. Flexer, causing him to be arrested, charging him with the unlawful placement and exposure in a public place on lands within Richland Township Bucks County, Pa., of poison and poisonous substances and admixtures thereof, with the intent that the same should be taken by wild animals, birds or fowl, etc., in violation of the act of assembly and the peace and dignity of the Commonwealth. A hearing was subsequently had before a local justice of the peace and the matter was returned to court, and defendant, Edwin W. Flexer, was subsequently indicted as hereinbefore mentioned.

22. As the result of his experience in the loss of his dogs, Mr. Freking had contemplated bringing injunction proceedings to restrain the governmental agencies from pursuing the poison program, but after consulting with his neighbor and legal advisor, Walter S. Hare, Esq., and being advised by him that such a proceeding would be lengthy and costly and that the act

was criminal, it was decided to pursue the latter method of putting an end to the program.

23. The purpose of Mr. Freking in bringing this prosecution, according to his testimony, was to force the State agencies to discontinue the poison program which he felt was against the law.

24. Shortly after Mr. Freking caused Mr. Flexer to be arrested, his neighbor, Walter S. Hare, aforesaid, lodged an information before J. Stanley Boorse, a justice of the peace in the Township of Richland, County of Bucks, against defendant, Thomas D. Frye, as executive director of the Pennsylvania Game Commission, charging him with causing, ordering, directing, instigating, supervising and performing, by himself and acting through certain agents, operatives of the Pennsylvania Game Commission and others, within the Townships of Richland, East Rockhill, West Rockhill and Haycock and other townships of the County of Bucks, with unlawfully placing, putting and exposing in public places along highways and on lands of said townships and elsewhere within the County of Bucks, poisons and poisonous admixtures with the intent that the same be taken or swallowed by birds, fowl and wild animals, contrary to the act and acts of assembly in such case made and provided and against the peace and dignity of the Commonwealth of Pennsylvania.

25. The purpose of Mr. Hare in lodging this information and causing defendant Frye to be arrested, according to his testimony, was to have the poison program abated and, either at the hearing or some other state of the proceedings, he offered to withdraw the prosecution against Frye if he would rescind the orders of the Game Commission.

26. The sole purpose of both of these prosecutions was to compel the Commonwealth to abate and discontinue the poison program.

*Discussion*

This proceeding grows out of two private prosecutions based on section 638 of the Act of June 24, 1939, P. L. 872, 18 PS §4638, commonly known and hereinafter referred to as the Criminal Code, which provides as follows:

"Whoever puts or exposes in any public place or highway, or on his own lands outside of his buildings, or on the lands of any other person, any poison, or admixture thereof, with the intent that the same shall be taken or swallowed by any bird, fowl, or wild animal, is guilty of a misdemeanor, and shall, on conviction, be sentenced to pay a fine not exceeding five hundred ($500) dollars, or to imprisonment not exceedings one (1) year, or both."

It is the Commonwealth's contention that since defendant, Edwin W. Flexer, has admitted placing poison tablets at diverse places within the County of Bucks for the purpose of destroying foxes, he should be convicted of the violation of this section of the code regardless of the fact that the placement of this poison was in pursuance of the orders and directions of his superiors and in the course of his employment with the Pennsylvania Game Commission.

The Commonwealth further contends that Thomas D. Frye, executive director and chief game protector under the Pennsylvania Game Commission, should also be convicted because he, as a superior officer of defendant, Edwin W. Flexer, caused, ordered and directed him, Edwin W. Flexer, to expose said poison on lands in divers townships in Bucks County, contrary to the act of assembly and was, therefore, equally guilty with Edwin W. Flexer, of violating the aforementioned section of the Criminal Code.

Defendants contend that they must be acquitted because the testimony fails to show:

1. That they committed the offenses charged in the informations and indictments, as required under section 638 of the Criminal Code.

2. That section 638 of the Criminal Code does not apply when the acts complained of are exercised, by reason of public authority, for the benefit and welfare of the citizens of the Commonwealth.

The defense is based upon the fact that these defendants were both public servants of the Commonwealth and acted under public authority; that the exposure of the poison was pursuant to a program initiated by the executive departments of the Commonwealth acting through its departmental agencies under their sovereign and police power; and that this action of these administrative agencies having the force of law, they, as officers, agents and employes of the Commonwealth, were not criminally liable for what they did in the performance of their official duties.

The basic question involved in this proceeding is, whether the Commonwealth, acting through its duly constituted and legally authorized executive departments and agents, may be hindered and restrained in exercising its police powers by this provision of our Criminal Code. The determination of this question, in all of its many ramifications, would entail an extended discussion, which we do not propose to pursue, but will confine ourselves to applying the established law, as we construe it, to the facts before us.

In view of the expressed purpose of both prosecutors in these actions, that they were brought to force the Commonwealth to discontinue the poison program, it seems unfortunate that they did not pursue Mr. Freking's original plan in order to test, if questionable, the use of the methods of the Commonwealth, to have sought an injunction wherein the whole matter could have been effectively decided, rather than to procure the arrest of two of its employes, and thereby save

the latter from annoyance, embarrassment, worriment and expense. Just why they should want to penalize these subordinates for doing some act in line of their duty, in accordance with the instructions from their superiors, is not clear. Their explanation is that it was done to force the Commonwealth to discontinue the program which these defendants were helping to carry out, and that this procedure would be less expensive and more effective.

The prosecutors contend, as we have hereinbefore noted, that, notwithstanding defendants were agents of the Commonwealth, they were not relieved of criminal responsibility, although the act was done within the scope of their employment.

We are familiar with the elementary legal principle that public officers, like other persons, may be liable criminally for violations of the general penal laws. Also, that no public officer, however high his position, is above the law. However, whether a public officer is immune from the provisions of a particular penal statute depends upon the terms of that statute and the construction to be given to it and, we may add, the circumstances under which the alleged criminal offense was committed.

Furthermore, while the mere fact that an officer is acting in an official capacity may not relieve him from criminal liability, he will not be held liable under a statute that clearly does not apply to him: 43 Am. Jur. 130, §331; Sherman et al. v. United States, 282 U. S. 25, 75 L. Ed. 143; 43 Am. Jur. p. 126, §§327, et seq.; 67 C. J. S. 430, §§133, et seq. A review of the cases cited in support of the principle that public officers are not immune from liability for violation of the general penal laws reveals that they involved some misdemeanor in office or abuse of privilege.

There is also authority to the effect that an act done by an officer, agent, or representative of the govern-

ment, acting under the direction of its superior officer of the government, will not constitute a ground of defense and exempt the person so acting from a personal liability for the wrongful act: 1 Wharton's Criminal Law, 12 ed., § 377, p. 502. In a more recent publication, however, "Criminal Law" (Dangel), published in 1951, the author states (§74, p. 532):

"Acts, otherwise criminal are legally justified when committed under public authority: (1) exactly as authorized; (2) within the scope of authorization; (3) within the domain of such authority. A public officer is not criminally responsible for conduct necessary to the performance of his duty."

With reference to the criminal liability of a public officer or employe for an act malum prohibitum committed in line of duty, as in the instant case, depending upon the circumstances under which it was committed, is the case of People v. Fitzgerald, 105 N. Y. 146, 11 N. E. 378. In that case a person, at the instance of the coroner, a legally constituted public officer, removed a dead body from a grave for the purpose of ascertaining whether a crime had been committed in producing the death of the person whose body was exhumed. He was indicted and convicted for violating a provision of The Penal Code, which made it a penal offense where a person removes a dead body of a human being from a grave or other place while awaiting burial, without authorization of law, with intent to steal the same or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness. The court of appeals reversed the conviction and ruled that the intent of the statute was manifest and that it certainly was not intended to apply to an exhumation made by legally constituted authorities for the purpose of ascertaining whether a crime had been committed in producing the death of the person whose body was ex-

humed and, further, that any irregularities on the part of the coroner were not sufficient to deprive his acts of their legal authority. Also, in Ex Parte Dickson, 14 F. 2d 609, in which case a United States customs officer accidentally killed a driver of a smuggling automobile, in shooting to cripple the car, the defendant was arrested and charged by the State of New York with murder. Upon habeas corpus proceedings, the defendant was discharged, the court holding that force was justified under the circumstances of the case. See also, State v. Gorham, 9 A. L. R. 365, in which case a deputy sheriff was exonerated for exceeding the speed limits while pursuing a person attempting to escape arrest. Our courts have repeatedly ruled that, even in the absence of statutory immunity, officers in pursuing criminals were not liable for violations of the speed statutes or ordinances. It is also a general rule that a public officer is not personally liable in private actions for acts done in line of duty and within the scope of his official authority. See 43 Am. Jur., 35, §273; 67 C. J. S. 417, §125. Should convictions of public officers in carrying out a governmental function, as being in violation of a criminal statute, be upheld, it would put all governmental officers, agents and employes in fear of arrest when carrying out the orders of their superiors, if there was a doubt in their minds as to a criminal violation.

The Pennsylvania Game Commission, the Department of Health, and the Department of Agriculture are administrative agencies of the executive department of the Commonwealth of Pennsylvania.

The Pennsylvania Game Commission is charged by law to perform certain acts in the interest of all the citizens of the Commonwealth. It is the sovereign when it performs the functions with relation to game. The general ownership of wild animals, so far as they are capable of ownership, is in the Commonwealth, not

as a proprietor, but in its collective sovereign capacity, for the benefit of all its citizens, in common, and the Commonwealth may, in the exercise of its police powers, regulate and make laws for their protection, preservation, propagation and capture. See 2 Am. Jur. 694, §8. Under the provisions of section 210 of the Game Law of Pennsylvania of June 3, 1937, P. L. 1225, 34 PS §1311.210, the Game Commission is mandated: ". . . to protect, propagate, manage, and preserve the game, fur-bearing animals, and protected birds of the State, and to enforce, by proper action and proceedings, the laws of this Commonwealth relating thereto." More specifically, section 201, 34 PS §1311.201, states in part:

"Except as otherwise provided by this act, the Pennsylvania Game Commission shall have and possess all the powers generally conferred, and perform all the duties generally imposed upon, independent administrative boards and commissions by the Administrative Code of 1929 and its amendments." Again, in section 210, supra, it is provided: "It is the duty of said commission to protect, . . . preserve the game, . . . and to enforce, by proper action and proceedings. . . ."

The preservation of game is held to be within the police power of the State and all laws which tend for their protection are considered a valid exercise of that power. In Commonwealth v. Patsone, 231 Pa. 46, affirmed 232 U. S. 138; Commonwealth v. McComb, 39 Pa. Superior Ct. 411, affirmed by the Pennsylvania Supreme Court, the court states on page 414:

"The preservation of game and fish has always been treated as within the proper domain of the police power, and laws, . . . prescribing the manner in which they may be taken, have been repeatedly upheld by the courts. . . ."

In Geer v. Connecticut, 161 U. S. 519, 530, the United States Supreme Court held that a State has

an absolute right to control the killing of game if it is necessary for the health and safety of its citizens. In considering the aforementioned authorities, it should be borne in mind that the Pennsylvania Bounty Law, which prescribes that bounty shall be paid for foxes, which are legally considered predatory animals, does not prescribe the method to be used in killing such animals before the bounty will be paid for them.

It was argued by the Commonwealth that the Game Law prohibits the use of poison against wildlife; that section 603 thereof, 34 PS §1311.03, made it illegal to use poison to take fur-bearing animals; that section 724, ibid §1311.724, prohibits the use of poison exposed, etc., in the killing of game destroying property; and that section 703, ibid §1311.703, prohibits the use of poison in killing racoons. In answer to this, we would call attention to another provision of the Game Code, to wit: section 215, ibid, §1311.215, which states:

"None of the provisions or requirements of this act shall be construed to apply to any member of the commission or any of its lawfully qualified representatives or duly authorized agents when acting in any manner for the Commonwealth, or to prevent such persons from capturing or destroying birds or animals of any kind when acting for the Commonwealth."

The State Department of Health, another of the departments involved in this proceeding, is also an executive administrative agency established under the authority of the Administrative Code of April 9, 1929, P. L. 177, sec. 2101, et seq., 71 PS §531 et seq. Section 2102, 71 PS §532, of the code, as amended, provides, inter alia, as follows:

"The Department of Health shall have the power, and its duty shall be:

"(a) To protect the health of the people of this Commonwealth, and to determine and employ the most effi-

cient and practical means for the prevention and suppression of disease;

"(c) To order nuisances, detrimental to the public health, or the causes of disease and mortality to be abated and removed, and to enforce quarantine regulations."

It is evident in the wording of section (a) of the above portion of the act that the Department of Health, in many instances, when facing necessary and immediate action, is given emergency powers to deal, as it deems wise under the circumstances, with epidemics, which may be a threat to the health of the people of the Commonwealth. We agree, as argued by counsel for the Commonwealth, that under our constitutional system, emergency cannot create power nor diminish restrictions. It merely marks the occasion when power should be exercised. See Beaver County Building and Loan Association v. Winowich et ux., 323 Pa. 483, 510. In the case of Commonwealth ex rel. v. Banholzer et ux., 304 Pa. 579, the court recognizes the existence of such emergency powers in the Department of Health. Also, in the case of Paris v. Philadelphia, 63 Pa. Superior Ct. 41, 47, 48, in a case involving the power of the Department of Public Health and Charities of Philadelphia to abate a piggery because it had been conducted in such a way as to be a public nuisance and detrimental to the public health, the Superior Court said:

" 'They are vested with quasi-judicial authority to decide upon what constitutes a nuisance, and all presumptions favor their action . . .' A strong abuse of authority must be shown to induce a court to interfere with the decisions of a Board of Health." This decision was approved and followed in a similar case by the Supreme Court: Lutz v. Department of Health et al., 304 Pa. 572.

The other and remaining department involved in this proceeding is the Department of Agriculture. This department was created by the Administrative Code of 1929, supra, section 201, 71 PS §61. Section 1701 of said code, 71 PS §441, authorizes the Department of Agriculture to continue all the powers and perform all the duties by law vested in and imposed upon said department, the several former bureaus thereof and the Secretary of Agriculture. The Department of Agriculture is particularly charged with the prevention and suppression of disease. Among the powers and duties of this department is to establish general quarantine relating to diseases of animals or plants and their products and to make all needful rules and regulations for the enforcement of the laws relating to animals and plants, or the products thereof: Act of April 17, 1929, P. L. 533, 3 PS §§342, et seq. Section 10 of said act, 3 PS §350, makes it unlawful for any person to impede, hinder, interfere with any officer or agent of the department in the performance of duties imposed by said act. This department is also charged with paying claims for cattle destroyed through rabies. Statistics show that these claims are very much on the increase as the result of the epidemic in question.

It will be noted that each of the aforementioned agencies is charged with the duty of protecting the welfare of the citizens and the domestic and wildlife animals of the Commonwealth in different phases of their governmental administration. Because of their respective and related functions, these departments all became involved in the suppression and extermination of the rabies epidemic. They not only joined forces and coöperated with each other, as required and provided by section 502 of the Administrative Code, supra, as amended, 71 PS §182, but they also called in the United States Fish and Wildlife Service for expert advice, in

their combined effort to determine upon the best method to control the situation which, as the result of their survey, had indicated that rabies among foxes had reached epidemic proportions of the most serious nature, and that the necessities of the situation required immediate and drastic action. They were unanimously convinced that if such action were not taken immediately, the disease would spread and the health of the people be greatly endangered.

Before embarking upon the program of poison, all other methods suggested were considered, including trapping, hunting, and the increase of bounties. These were not considered sufficient to bring the epidemic under immediate control. After consulting with the United States Wildlife Service and other authorities which previously had experience with rabies control, and after a thorough investigation of the best medical advice available from both the Commonwealth and the United States Wildlife Service experts, the poison program was decided upon, and submitted to the Governor for approval. The Governor approved it and, after being assured by the Attorney General's Department of the legality of the proposed procedure, the program was initiated, using the particular poison suggested by the United States Wildlife Service and furnished by them, which poison was then placed in such bait form as suggested by the service.

The question naturally arises as to whether these officials, in establishing this program, acted within the scope of their powers and, if so, could their program be legally enforced in view of the prohibitory provision of the aforesaid section 638 of the Criminal Code.

We are not only convinced that the departmental authorities acted within their extensive sovereign and police powers which were delegated to them by the legislature, but it is difficult to conceive that any person, much less those who are specifically charged with the

protection and preservation of the public health and welfare, including not only humans, but also the animal population, both domestic and wild, would sit supinely by and see our State overrun with rabid wild animals, spreading disease in epidemic proportions and endangering the lives of our people, of domestic and other wild animals, without taking prompt, effective measures to suppress, overcome and eradicate the cause by the best method available, regardless of any penal prohibitory act in conflict with the method pursued. We fully appreciate the sentimental attachment for dogs and other animals, but the protection and preservation of the health of the public cannot be fettered by any prohibitory statute, of doubtful application.

These departments or agencies which planned and instituted this poison program are a part of our State government and acted under valid delegated legislative authority. See United States v. Pennsylvania Co., 235 Fed. 961; Commonwealth v. Koneff, 22 D. & C. 515, and cases therein cited. The law is well established that while the legislature may not delegate any powers purely legislative unless expressly directed or permitted by the Constitution, it may delegate its other powers and may confer discretion in the administration of the law. Accordingly, the legislature may, unless the Constitution expressly provides otherwise, leave to the executive department matters of administrative detail, including the making of regulations and the determination of the facts: 16 C. J. S. 133, 138, §70.

In Field v. Clark, 143 U. S. 649, 693, 694, the court, with reference to the delegation of power to make administrative rules, said it is a well known principle of law that:

" 'The legislature can not delegate its power to make a law; but it can make a law to delegate a power to

determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which can not be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation'."

The authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character, because the violation thereof is punishable as a public offense. The true distinction as to delegation of powers by the legislature is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.

We have been unable to find many decisions on the precise legal questions raised in this case. This may be explained by the fact that criminal prosecutions of governmental employes for carrying out their orders, especially when, as hereinbefore noted, no other efficient and conclusive remedies were available, are rare. The remedy here sought by the prosecution did not prevent the carrying out of the program embarked upon by the Commonwealth but, if followed through, it might have resulted in the arrest of every agent, employe and official, including the members of the Game Commission, Secretary of Agriculture, Secretary of Health, and perhaps even the Governor.

In the case of State v. Mayor and Alderman of Knoxville, 80 Tenn. 146, the mayor and the alderman were indicted and convicted for violating a statute which was designed to prevent the burning of anything which might give rise to unwholesome, noxious smells

in the community. In this case, the city authorities burned certain infected bedding and clothing to prevent the spread of smallpox, which was a serious epidemic in that city. The question involved was, whether these officials, in the exercise of their governmental functions, were guilty of a criminal violation when they were exercising inherent police powers belonging to governments and for the benefit of all the people. The court, in ruling that defendants were not guilty, says in effect on page 156: That where infection in case of prevalent epidemics is likely to spread rapidly and certainly, officials had the right to make such regulations as would tend to isolate the infected from contact with the general public. The failure to exercise such power would be deemed to this age a mark of a crude and undeveloped civilization.

The court also gives a very thorough discussion of the exercise of police power for the benefit of the general welfare of the people of the Commonwealth and, in setting aside the conviction, states on page 156 as follows:

"The rule applicable to such a case is, that if the act was done by public authority or sanction, and in good faith, and was done for the public safety, and to prevent the spread of the disease, and such means used as are usually resorted to and approved by medical science in such cases, and was done with reasonable care and regard for the safety of others, then the parties were justified in what they did, and the parties inconvenienced could not complain, nor could the State enforce a criminal liability for results of temporary inconvenience or unpleasantness that accrue from the use of such proper and accredited means for the safety of the community against the spread of disease."

Again, in Miller v. Horton et al., 152 Mass. 540, 10 L. R. A. 116, 26 N. E. 100, which was an action in tort for the killing of plaintiff's horse, defendants, who

were the township commissioners on contagious diseases among domestic animals, under statutory authority had condemned an animal affected with glanders and directed it to be killed. Instead of killing the diseased animal, they killed a healthy one by mistake, and the owner brought an action to recover compensation against the commissioners. Defendants admitted the killing of the horse, but justified the act by showing that they were members of the township board of health and that they did so in obedience to the order of the commissioners for contagious diseases among domestic animals, which required the board of health to cause the animal to be killed. In an exhaustive discussion by a divided court, Devens, J., in the dissenting opinion, stated in effect that the law involved was a police regulation and the adjudication was made by a tribunal acting semi-judicially, of the same general character as the board of health, who have power for the abatement of nuisances and for the protection of the public health. Also, that their determination, in speaking of the proceedings of boards of health in questions of discretion and judgment in the discharge of their duties, is undoubtedly in the nature of a judicial decision, and, within the scope of the power conferred, and for the purposes for which the determination is required to be made, it is conclusive. It is not to be impeached or set aside for error or mistake of judgment, nor to be reviewed in the light of new or additional facts. The officer or board to whom such determination is confided, and all those employed to carry it into effect, or who may have occasion to act upon it, are protected by it, and may safely rely upon its validity for their defense.

In the recent case of Matson v. Margiotti, 371 Pa. 188, which was an action in tort against defendant, who was Attorney General of the Commonwealth of Pennsylvania, for libel and defamation, the court held

that defendant was immune from any liability for damages arising out of false and defamatory statements, provided they were made or the actions were taken in the course of and within the scope of his authority or within his jurisdiction.

The extent and limitations of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every State in the union. It is universally conceded to include everything essential to the public safety, health, and morals and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. It " 'is the greatest and most powerful attribute of government; upon it the very existence of the State depends. . . . If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail.' It needs no constitutional reservation or declaration to support it": Commonwealth v. Stofchek, 322 Pa. 513, 519; Commonwealth v. Widovich et al., 295 Pa. 311; City of Scranton v. Public Service Commission et al., 268 Pa. 192. This power includes the regulation of the manner in which wild animals may be captured and may make laws for their protection, preservation and propagation: Barrett et al. v. State, 158 N. Y. S. 1055; Commonwealth et al. v. Masden, 295 Ky. 861, 175 S. W. 2d 1004; Lehman et al v. Pennsylvania Game Comm., et al., 34 D. & C. 662.

Defendants also urge that section 638 of the Criminal Code is not applicable as to them, under the circumstances, and that they do not come within the legislative intent of the act, according to its provisions. They contend that, since all criminal statutes must be strictly construed, unless the Commonwealth, its officers, agents and employes are specifically referred to and included in the statute, they are not subject to its provisions if they are carrying out governmental func-

tions. This defense is based upon the theory that a statute is never presumed to deprive the State of any prerogative, right or property, unless the intention to do so is clearly manifest, either by express terms or necessary implication. It is an old established principle of law that the State is not to be considered within the purview of a statute, however general and comprehensive the language of the statute may be, unless it is expressly named therein. General legislation is intended primarily for the subjects and not for the sovereign: 49 Am. Jur., p. 235, §14; 59 C. J. 1121, §663. Likewise, in actions against State officials, it has been held that while a suit against State officials is not necessarily a suit against the State, within the rule of immunity of the State without its consent, that rule cannot be evaded by bringing an action nominally against a State officer or a State board, commission, or department in his or its official capacity, when the real claim is against the State itself and the State is the party vitally interested.

If the rights of the State would be directly and adversely affected by the judgment or decree sought, the State is a necessary party defendant, and if it cannot be made a party, that is, if it has not consented to be sued, the suit is not maintainable. 49 Am. Jur., p. 304, §92; Love et al. v. Filtsch et al., 44 L. R. A. (N.S.) 212. In Sayers v. Bullar et al., 180 Va. 222, 22 S. E. 2d 9, which was an action brought against two individual employes of the State to recover damages alleged to have been sustained as the result of certain explosions set off by them in the construction of a county pipeline for the State of Virginia, defendants, in that case as in the case before us, contended that they were not liable because the acts complained of were done by the State through its duly constituted officers, agents and employes, and that defendants

insofar as they did such acts, did them only as agents and employes of the Commonwealth. The court, in declaring them not liable and that they were immune from suit under the circumstances, says on page 225:

"A State cannot be sued except by its permission, and even if the suit, in form, be against the officers and agents of the State, yet if, in effect, it be against the State, it is not maintainable."

The court further ruled that it would be an unwise policy to permit agents and employes of the State to be sued in their personal capacity for acts done by them at the express direction of the State, unless they departed from that direction.

This rule that the Commonwealth is not bound by an act of legislature unless named therein, has come down to us from the earliest times. In section 161, p. 223, Endlich, "Interpretation of Statutes," the rule is set forth as follows:

". . . The Crown is not bound by a statute unless named in it. It has been said that the law is prima facie presumed to be made for subjects only, that 'the general business of the legislative power is to establish laws for individuals, not for the sovereign'. At all events, the Crown is not reached except by express words, or by necessary implication, in any case where it would be ousted of an existing prerogative or interest. It is presumed that the legislature does not intend to deprive the Crown of any prerogative, right or property, unless it expresses its intention to do so in explicit terms, or makes the inference irresistible. Where, therefore, the language of the statute is general, and in its wide and natural sense would divest or take away any prerogative or right, title or interests from the Crown, it is construed so as to exclude that effect."

(See Commonwealth v. Wilcox, 46 D. & C. 435; Culver v. Commonwealth, 348 Pa. 472, and cases cited;

Pittsburgh Public Parking Authority Petition, 366 Pa. 10).

While we have not been referred to or able to find any case holding that this principle is not applicable to the criminal statutes, we must, in the absence thereof, construe the law as being applicable to the case before us. Section 638 of the Criminal Code, 18 PS §4638, which is the basis of this action, reads in part: "Whoever" puts or exposes . . . any poison . . . , etc., clearly has reference to an individual. Furthermore, the code, in defining the term "Whoever" states: "Person", and "whoever" includes an individual, copartnership, association and corporation. (18 PS §4103).

While we are aware that there are decisions to the effect that the immunity of a State does not extend to its officers and that, as a general rule, State officers and agents are personally liable in tort for unauthorized acts committed by them in the performance of their official duties (Meads et ux. v. Rutter, 122 Pa. Superior Ct. 64, 70; 59 C. J. 146, §228), this principle is based on the theory that, although the municipality appoints to office, it does not sanction their official delinquencies or render itself liable to their official misconduct. We think the case before us is very different and there is no doubt that, although defendants are the nominal parties therein, the action admittedly was primarily directed at the State, and was intended to enjoin these departments who were charged with the eradication of rabies among foxes and other wild animals, from continuing their program. There is no evidence of any delinquencies or any unauthorized acts on the part of these defendants in the performance of their duties. On the contrary, they acted in good faith in accordance with the instructions given them by their superiors, without intent to violate any criminal statute.

After a review of all the facts and circumstances involved and the law applicable to the issues, we are not satisfied, beyond a reasonable doubt, that defendants are guilty of the criminal offenses charged and, therefore, we have reached the following conclusions of law:

### Conclusions of Law

1. The Pennsylvania Game Commission, the Department of Agriculture, and the Department of Health are departmental agencies of the Commonwealth of Pennsylvania, and as such are charged with the duty of protecting the health and welfare of the citizens, and also the domestic and wildlife animals of the Commonwealth, in different phases of our governmental administration.

2. These agencies are possessed of extensive and legally delegated sovereign and police powers to carry out the duties with which they are charged, and may exercise discretion as to the methods to be pursued.

3. The agencies, in the lawful exercise of their sovereign and police powers, are not subject to any of the provisions and restrictions contained in section 638 of the Criminal Code of June 24, 1939, P. L. 872.

4. The action of the departmental agencies in initiating and pursuing the program to control and overcome a serious epidemic of rabies among foxes and other wild animals by means of poison, was not in violation of section 638 of the Criminal Code, aforesaid.

5. The departmental agencies aforesaid, under the facts of this case, acted within their sovereign and police power delegated to them by the legislature.

6. Neither of the defendants, Edwin W. Flexer and Thomas D. Frye, as agents and employes of the Pennsylvania Game Commission, committed any offense in violation of section 638 of the Criminal Code, afore-

said, in their faithful performance and execution of the orders, directions and instructions given them by the Pennsylvania Game Commission, in connection with the enforcement of the Commonwealth's poison program to control, overcome, and eradicate the rabies epidemic and the causes thereof.

7. Defendant, Thomas D. Frye, did not commit the offense charged in the information and indictment as required under section 638 of the Criminal Code.

8. Neither of the defendants, Edwin W. Flexer and Thomas D. Frye, as agents and employes aforesaid, committed any criminal offense within the intendment and meaning of the Criminal Code, aforesaid.

9. Thomas D. Frye was never within the jurisdiction of the Bucks County courts during the particular times alleged in the indictment for the commission of the offense. The mere transmission and relaying of the directory orders received by him from the Pennsylvania Game Commission to other supervisors and employes of said Commission did not bring him within the jurisdiction of this court.

10. Section 638 of the Criminal Code does not and was not intended to hinder the exercise of the sovereign and police power of the executive or administrative agencies of the Commonwealth in the execution of their duties and, therefore, has no application to this case.

11. The Commonwealth has failed to establish the guilt of either of the defendants, Edwin W. Flexer and Thomas D. Frye, beyond a reasonable doubt and, consequently, they must be found not guilty of the offenses charged.

### Verdict

And now, to wit September 2, 1952, defendant, Edwin W. Flexer, charged on bill of indictment no. 27, May sessions, 1952, with the offense of unlawfully

placing poison, is declared not guilty and is discharged. Defendant, Thomas D. Frye, charged on bill of indictment no. 47, May sessions, 1952, with the offense of unlawfully placing poison, is also declared not guilty and is discharged.

The costs of prosecution are directed to be paid by the County of Bucks.